# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RONALD P. WLEKLINSKI,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

Defendant.

No. 11 C 3277

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Ronald P. Wleklinski filed this action seeking reversal of the final decision of the Commissioner of Social Security (Commissioner) denying his application for Disability Insurance Benefits under Title II of the Social Security Act (SSA). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB) under Title II of the SSA, a claimant must establish that he or she is disabled within the meaning of the SSA.[2]

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 26(d)(1).

*York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on July 20, 2007, alleging that he became disabled on August 1, 2006, because of arthritis, high blood pressure, abnormal growth in neck, possible heart condition, possible neurological problems, and vision problems. (R. at 10, 47, 48, 53). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 10, 47–53, 57–66).

On December 14, 2009, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (R. at 10, 20–46). The ALJ also heard testimony from William M. Newman, a vocational expert (VE). (*Id.* at 10, 20–46, 71).

The ALJ denied Plaintiff's request for benefits on January 4, 2010. (R. at 10–15). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since August 1, 2006, the alleged onset date. (*Id.* at 12). At step two, the ALJ found that Plaintiff's rheumatoid arthritis and hypertension are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.*).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[3] and determined that he can perform the full range of light work as defined in 20 C.F.R.

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum

§ 404.1567(b). (R. at 13). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is capable of performing past relevant work as a service manager, operations manager, and vice president of operations. (*Id.* at 15). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.*).

The Appeals Council denied Plaintiff's request for review on March 22, 2011. (R. at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more

---

that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. DISCUSSION

### A. The Relevant Medical Evidence

In an office examination on July 24, 2006, Ellen Kochman, M.D. noted pain, stiffness, and swelling in Plaintiff's hands, wrists, and knees, which had been present for over three months but was worsening at the time. (R. at 270, 273). She diagnosed possible rheumatoid arthritis,[4] along with hypertension and Barrett's

---

[4] Rheumatoid arthritis is a "chronic syndrome characterized by nonspecific, usually symmetric inflammation of the peripheral joints." *The Merck Manual* 416 (17th ed. 1999).

esophagus.[5] (*Id.* at 270). Dr. Kochman referred Plaintiff to Bruce Johnson, M.D., a rheumatologist. (*Id.* at 273).

On August 28, 2006, Plaintiff began treating with Dr. Johnson on a monthly basis. (R. at 273, 289). Dr. Johnson examined Plaintiff and noted impingement of the left shoulder, and swelling and tenderness in both wrists and hands. (*Id.* at 289, 292). He diagnosed rheumatoid arthritis and prescribed Arava and an initial dose of Prednisone. (*Id.* at 290, 292). On September 28, 2006, Dr. Johnson observed that Plaintiff had a very good response to the medications. (*Id.* at 290; *see id.* at 287). On November 2, 2006, Plaintiff reported "doing quite well with no return of his previous symptoms [and] tolerating Arava without side effects." (*Id.* at 287). Dr. Johnson reported that Plaintiff's lab work was normal and continued the Arava dosage. (*Id.*). On January 4, 2007, Plaintiff reported "some pain" and swelling from his arthritis. (*Id.* at 354). By March 8, 2007, Plaintiff reported feeling "good" and on May 17, 2007, he stated he was feeling "very good." (*Id.* at 352–53). On August 16, 2007, Plaintiff reported pain and swelling in his wrist, shoulder, and ankle. (*Id.* at 351). Dr. Johnson concluded that Plaintiff's rheumatoid arthritis was "very active." (*Id.*). On October 18, 2007, Dr. Johnson opined that Plaintiff's rheumatoid arthritis was "active." (*Id.* at 350).

On October 5, 2007, Sandra Hare, M.D. performed an internal medicine consultative examination on behalf of the Commissioner. (R. at 324–27). Prior to the ex-

---

[5] "Barrett's esophagus is a condition in which the cells of [the] lower esophagus become damaged, usually from repeated exposure to stomach acid." <www.mayoclinic.com/health/barretts-esophagus>

amination, Dr. Hare reviewed Dr. Johnson's treatment notes for March 8 and May 17, 2007. (*Id.* at 324). Plaintiff told Dr. Hare that he suffers from rheumatoid arthritis in his hands, shoulders, hips, feet, and wrists, and that it flares up once or twice a month. (*Id.* at 324–25). Dr. Hare performed a full physical examination. (*Id.* at 325–27). She found deformity and tenderness around Plaintiff's ankles. (*Id.* at 326). Upon a musculoskeletal examination, Dr. Hare found:

> Range of motion was normal in all joints. [Plaintiff] can walk 50 feet unassisted. He can do heel to toe. He can walk on his heels and walk on his toes. He also has some bony deformity noted of the knees although his range of motion is full to 150 degrees of flexion and can extend to 0 degrees bilaterally. Hands: He has bilateral wrist thickening and has tenderness upon flexion and extension of his wrists, worse on the right than the left. Although he has full range of motion in both wrists. He also has deformity of the first metacarpal phalangeal joint bilaterally as well as tenderness over the 2nd and 3rd metacarpal joints on both the flexor and extensor services bilaterally. There is significant deformity over the right ulnar styloid bone where he is somewhat tender. There is no active tenosynovitis[6] noted at this particular time. His grip strength is 5/5 bilaterally.

(*Id.* at 326–27). She diagnosed rheumatoid arthritis, affecting multiple joints; hypertension, not controlled; history of hypercholesterolemia; and history of left branch block.[7] (*Id.* at 327).

On October 18, 2007, David Mack, M.D., a nonexamining state-agency consultant, reviewed Plaintiff's records and concluded that he can perform light work with

---

[6] Tenosynovitis is the "[i]nflammation of a tendon and its enveloping sheath." *Stedman's Medical Dictionary* 1417 (5th ed. 1982).

[7] "Bundle branch block is a condition in which there's a delay or obstruction along the pathway that electrical impulses travel to make your heart beat. The delay or blockage may occur on the pathway that sends electrical impulses to the left or the right side of your heart. . . There's no specific treatment for bundle branch block itself. However, any underlying health condition that caused bundle branch block, such as heart disease, will need to be treated." < http://www.mayoclinic.com/health/bundle-branch-block/DS00693>

only occasional climbing. (R. at 339–46). On March 7, 2008, Calixto Aquino, M.D. agreed with Dr. Mack's assessments. (*Id.* at 371–73).

On February 28, 2008, Plaintiff reported to his treating physician that he had good response to Arava until November 2007, at which point Humira was added with good response.[8] (R. at 368). Plaintiff stated that he gets occasional morning stiffness with intermittent swelling when he is getting near the time for his Humira injection. (*Id.*). In June 2008, Plaquenil was added to his medicine regimen.[9] (*Id.* at 375).

In August 2008, Plaintiff reported a flare-up of his symptoms that was slowly resolving after two weeks. (R. at 375). Rodney Tehrani, M.D. continued Arava and Humira and recommended that Plaintiff give Plaquenil more time for full efficiency. (*Id.*). On March 24, 2009, Plaintiff reported a flare-up in his shoulders in the prior week and started a Prednisone taper prescribed by Dr. Johnson. (*Id.* at 423). Other than one hour of morning stiffness, Plaintiff had no other complaints. (*Id.*). Upon examination, Dr. Tehrani noted mild inflammation and recommended a change in medication regimen. (*Id.*). Because he had just bought a house in Florida, Plaintiff requested no change in his medications. (*Id.*).

On August 14, 2009, Plaintiff began treating with Steven Fink, D.O., a rheumatology specialist. (R. at 378–79). Plaintiff confirmed that he was still taking Arava,

---

[8] Humira (Adalimumab) injection is used alone or with other medications to relieve the symptoms associated with rheumatoid arthritis. It is typically injected once every other week. <www.nlm.nih.gov/medlineplus [hereinafter MedlinePlus]>

[9] Plaquenil (Hydroxchloroquine) is used to treat rheumatoid arthritis in patients whose symptoms have not improved with other treatments. *See* MedlinePlus.

Humira, and Plaquenil. (*Id.* at 378). He reported 30 to 40 minutes of morning stiffness, but otherwise doing well. (*Id.*). Plaintiff denied any side effects from his medication and any extra-articular manifestations of rheumatoid arthritis. (*Id.*). A rheumatoid factor blood test was negative. (*Id.* at 379). Upon examination, Dr. Fink found diminished range of motion of Plaintiff's shoulders, full range of motion of his elbows with no radial humeral crepitus, mild swelling of his hands, no nodules, rashes, ulcers, or vasculitic lesions, mild hammertoes, and no focal deficits, cyanosis, edema, or clubbing. (*Id.*). Dr. Fink diagnosed history of rheumatoid arthritis and concluded that Plaintiff was doing well on his current regimen. (*Id.*).

At the December 14, 2009 hearing, Plaintiff testified that for the last 15 to 20 years, his rheumatoid arthritis flares up two to five times a month. (R. at 28). When he has a flare-up in his hip, he is only able to walk backwards, by dragging his left leg. (*Id.*). When the flare-up is in his hand, it swells up, doubling in size. (*Id.*). Plaintiff stated that the flare-ups have become more frequent, occurring about once a week. (*Id.* at 31). He testified that he has constant, mild pain (2/10) in his elbow and hip. (*Id.* at 33). Plaintiff denied being able to exercise because of his arthritis, but acknowledged playing golf at his new home in Florida. (*Id.* at 32–33).

## B. Analysis

Plaintiff raises three arguments in support of his request for a reversal and remand: (1) the ALJ's determination at step three was erroneous; (2) the ALJ's RFC determination was erroneous; and (3) the ALJ's credibility determination was patently wrong. (Mot. 1, 5–12). The Court addresses each argument in turn.

### *1. Plaintiff's Credibility*

Plaintiff contends that the ALJ erred in discounting his testimony about the nature and extent of his ailments. (Mot. 11–12). He asserts that the ALJ used conclusory boilerplate to discount Plaintiff's credibility, did not identify which of Plaintiff's statements were not credible, and failed to use a medical expert (ME) at the hearing. (*Id.*).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR)[10] 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical

---

[10] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

### a. Boilerplate Language

Plaintiff contends that the ALJ used meaningless boilerplate language to discredit Plaintiff's statements, which resulted in result-oriented decision making. (Mot. 11). In his decision, the ALJ stated in part:

> After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of

these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 13). This is the same language that the Seventh Circuit has repeatedly described as "meaningless boilerplate" because it "yields no clue to what weight the [ALJ] gave the testimony" and fails to link the conclusory statements made with the objective evidence in the record. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). "However, the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013). The ALJ did that here.

In his decision, the ALJ also stated:

> [Plaintiff's] testimony as to limitations is not supported by the objective medical evidence of record. His treatment records are very limited and do not support the degree of limitation alleged. [Plaintiff] testified that he left his last job because he was offered a buy-out by his employer and not because of his impairments or inability to perform his job. [Plaintiff] testified that he lives on a golf course in Florida and golfed at least 5 times last year. The undersigned notes that his alleged flare ups are mostly by report of [Plaintiff], are relatively infrequent, and as recently as March 2009, inflammation was only mild. [Plaintiff] was able to participate in the hearing without any overt pain behavior noted.

(R. at 14). These statements allow the Court to sufficiently analyze what the ALJ relied on when he concluded that Plaintiff was not credible. *See Pepper*, 712 F.3d at 368.

### b. *The ALJ Provided Specific Reasons for His Credibility Finding*

Plaintiff testified that for the last 15 to 20 years, his rheumatoid arthritis flares up two to five times a month. (R. at 28). When it flare-ups in his hip, he is only able

to walk backwards, by dragging his left leg. (*Id.*). When the flare-up is in his hand, it swells up, doubling in size. (*Id.*). The ALJ found that Plaintiff's "treatment records are very limited and do not support the degree of limitation alleged." (*Id.* at 14). Plaintiff contends that the ALJ erroneously discredited his testimony by not identifying which medical records contradict Plaintiff's testimony. (Mot. 11–12). On the contrary, the ALJ correctly observed that Plaintiff's doctors frequently noted that his symptoms were controlled by medications with no side effects. (R. at 13–14).

The medical records do not support Plaintiff's testimony that he has had chronic, debilitating flare-ups of his rheumatoid arthritis for 15–20 years, including being unable to walk. Nor do the records support that his hand on occasion will double in size. Indeed, Plaintiff never mentioned such debilitating symptoms to any of his doctors. (*See* R. at 192–470). Instead, the medical records indicate that while Plaintiff on occasion has morning stiffness in his joints, the pain is generally minor[11] and the symptoms are largely controlled by medications, with no side effects. (*E.g.*, *id.* at 33 (constant, mild 2/10 pain), 287 (doing quite well with no return of previous symptoms and no side effects), 290 (good response to medications), 352–53 (feeling very good), 368 (good response to medications), 378 (30–40 minutes of morning stiffness, but otherwise doing well without any side effects), 379 (negative rheumatoid factor blood test), 423 (other than one hour of morning stiffness, no other complaints)).

---

[11] Plaintiff did complain of major pain (7/10 and 8/10) in February and May 2009, but these episodes appear connected to Plaintiff inexplicably stopping his Humira medication. (R. at 459, 460, 463). By August 2009, Plaintiff reported "doing well," other than morning stiffness. At the hearing in December 2009, Plaintiff described the pain as 2/10. (*Id.* at 33).

Moreover, physical examinations are largely unremarkable. For example, Dr. Hare found Plaintiff's range of motion normal in all joints, with some tenderness but no swelling. (*Id.* at 326–27). Plaintiff can walk unassisted for 50 feet, perform heel to toe walking, and walk on his heels and toes. (*Id.* at 326). And while Dr. Fink found diminished range of motion of Plaintiff's shoulders, he had full range of motion of his elbows with no radial humeral crepitus, mild swelling of his hands, no nodules, rashes, ulcers, or vasculitic lesions, mild hammertoes, and no focal deficits, cyanosis, edema, or clubbing. (*Id.* at 379). In sum, while Plaintiff has demonstrated some nondisabling symptoms, the ALJ properly concluded that "the record medical evidence established that those symptoms are largely controlled with proper medication and treatment." *See Skinner*, 478 F.3d at 845.

Plaintiff's testimony was also internally inconsistent. Although he stated that his rheumatoid arthritis affected his ability to work, he acknowledged that he left his previous job after they offered him a large buy-out and not because of his impairments or inability to work. (R. at 26–29). Plaintiff also testified that he quit exercising because it triggered the flare-ups of his arthritis. (*Id.* at 32). But he then acknowledged playing golf five times earlier in the year. (*Id.* at 33).

### c. *A Medical Expert Was Not Required*

Plaintiff also contends that the ALJ impermissibly relied on his own medical hunches rather than competent medical advice and should have used a medical expert (ME) at the hearing before discounting Plaintiff's testimony. (Mot. 12). The Court is not persuaded by this argument. An ALJ must "summon a medical expert

if that is necessary to provide an informed basis for determining whether the claimant is disabled." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *see also* 20 C.F.R. § 404.1527(e)(2)(iii). But "[a]n ALJ is not required to call a medical expert simply because a claimant has failed to meet his burden of demonstrating that he suffers from an impairment listed in the SSA." *Riley v. Astrue*, No. 11 C 3771, 2012 WL 1655970, at *3 n.2 (N.D. Ill. May 10, 2012); *see Canata v. Astrue*, No. 09 C 5649, 2011 WL 6780923, at *8 (N.D. Ill. Dec. 23, 2011) (decision to call an ME is left to ALJ's discretion). Here, the record provided an adequate basis for the ALJ's conclusion that Plaintiff was not credible. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (finding that where "the evidence was adequate for the ALJ to find [the claimant] not disabled, . . . the ALJ acted within his discretion in deciding not to call a medical expert"). Further, as discussed above, the medical record is replete with evidence that Plaintiff's symptoms are largely controlled by medication and treatment.

Under the circumstances, the Court cannot conclude that the ALJ's credibility determination was "patently wrong." *Craft*, 539 F.3d at 678. The ALJ provided specific reasons for his credibility finding, supported by substantial evidence. *Moss*, 555 F.3d at 561; *Steele*, 290 F.3d at 942.

## 2. The ALJ's Step-Three Determination

At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of

the listings enumerated in the regulations. (R. at 12). Specifically, that ALJ concluded that Plaintiff's rheumatoid arthritis

> does not meet or medically equal the criteria of 14.09 of the Listing of Impairments. There is no objective evidence of persistent inflammation or persistent deformity of one or more peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively or of an inability to ambulate effectively. There is also no objective evidence of marked limitation in his ability to perform activities of daily living, maintain social functioning, or maintain concentration, persistence or pace.

(*Id.*). Plaintiff asserts that he meets the criteria for at least two of the listed impairments—14.09(A) and 14.09(D)(1)—and disputes the ALJ's conclusion that there is no evidence of debilitating flare-ups of his rheumatoid arthritis. (Mot. 7). Plaintiff believes the ALJ's determination was perfunctory and did not consider evidence contrary to his conclusion. (*Id.* 5–7). The Court disagrees. Plaintiff has failed to meet his burden to demonstrate that his impairments satisfy all the requirements of Listings 14.09(A) and 14.09(D)(1). *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (The claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing."); *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (The "claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing.").

The medical evidence supports the ALJ's determination. Listing 14.09(A) requires persistent inflammation or deformity resulting in the inability to ambulate effectively or perform fine and gross movements effectively. 20 C.F.R. pt. 404, subpt. P, app. 1 § 14.09(A). The regulations define "inability to ambulate effectively" as

"having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* § 1.00(B)(2)(b) (citation omitted). There is no medical evidence indicating that Plaintiff cannot ambulate or perform fine and gross movements effectively. As discussed above, the ALJ properly discredited Plaintiff's testimony that he has had chronic, debilitating flare-ups of his rheumatoid arthritis for 15–20 years, which on occasion causes swelling in his hand, doubling in size, or necessitates that he walk backwards, dragging his left leg. Plaintiff never complained to his doctors that he had any trouble ambulating or performing fine and gross movements. Physical examinations were largely unremarkable—Plaintiff's range of motion was normal in all joints, with some tenderness and mild swelling; and he could walk unassisted for 50 feet, perform heel to toe walking, and walk on his heels and toes. (R. at 326–27, 379). And Plaintiff consistently reported that other than stiffness in the morning, his medications were effective at relieving his arthritis symptoms. (*Id.* at 287, 290, 352, 353, 368, 378, 379, 423).

Similarly, Plaintiff has presented no medical evidence to support qualifying for Listing 14.09(D)(1), which requires marked limitation of activities of daily living. 20 C.F.R. pt. 404, subpt. P, app. 1 § 14.09(D)(1). Other than occasional, minor pain and morning stiffness, Plaintiff never complained to his physicians about having any limitations to his activities of daily living, much less any *marked* limitations. He consistently acknowledged that his medications were relieving his symptoms, without any adverse effects. (R. at 287, 352, 353, 368, 378, 379, 423). At the hearing,

Plaintiff acknowledged having no mental impairments, and without the occasional flare-ups, he "function[s] just like everybody else would." (*Id.* at 29–30, 32). In support of Listing 14.09(D)(1), "Plaintiff testified that during periods of flare-ups, he is unable to do anything." (Mot. 7). But, as discussed above, the ALJ properly rejected Plaintiff's credibility.

In sum, Plaintiff has not met his burden of demonstrating that he meets all of the criteria for Listings 14.09(A) and 14.09(D)(1). *Ribaudo*, 458 F.3d at 583.

### 3. *The ALJ's Determination of Plaintiff's RFC*

The ALJ determined that Plaintiff has rheumatoid arthritis and hypertension, which cumulatively result in functional limitations. (R. at 12). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b). (*Id.*). Plaintiff argues that the ALJ erred by ignoring the evidence of his heart condition, failing to present a functional assessment or narrative discussion complying with SSR 96-8p, and failing to consider all of Plaintiff's impairments in combination, even those that are not severe. (Mot. 7–11). In particular, Plaintiff asserts that "the ALJ failed to present substantial evidence to support his conclusion that Plaintiff could perform a full range of light work when the record shows that Plaintiff was at risk for a heart condition and that he experienced significant and frequent episodic occurrences of flare-ups of rheumatoid arthritis." (*Id.* 10).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft*, 539 F.3d at 676. In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court finds that the ALJ's determination of Plaintiff's RFC was fully grounded in the medical evidence, including physicians' opinions and Plaintiff's testimony. His decision references specific medical evidence of Plaintiff's rheumatoid arthritis, including periodic flare-ups, hypertension, and sinus pressure. (R. at 13–14). While Plaintiff cites to medical notes regarding

his heart condition that the ALJ did not explicitly mention (Mot. 9), the ALJ is not required to discuss every piece of evidence, *Knox*, 327 F. App'x at 657–58 (7th Cir. 2009) ("The ALJ need not provide a written evaluation of every piece of evidence, but need only minimally articulate his reasoning so as to connect the evidence to his conclusions."). Plaintiff asserts that "Dr. Johnson's more recent records indicate that Plaintiff may be at risk if he were required to perform the 'full range' of light work." (Mot. 9). Significantly, Plaintiff fails to include a record citation, and the Court finds no evidence in the record—from Dr. Johnson or any other physician— that precludes Plaintiff from performing light work. Indeed, all of the records cited by Plaintiff for his various heart conditions—left bundle branch block, heart disease, hypertrophic cardiomyopathy, myocardial infraction—occurred prior to August 2006, while Plaintiff was still working. (R. at 26, 199, 204, 205, 208, 235, 270). Neither the physicians' records nor Plaintiff's testimony indicated that these heart ailments had any effect on his ability to work. Thus, Plaintiff has not explained how this "missing" evidence conflicts with the ALJ's RFC determination. *Knox*, 327 F. App'x at 657 ("[Claimant] does not draw our attention to any evidence that conflicts with the ALJ's conclusion.").

Moreover, in making his recommendation that Plaintiff was capable of performing light work (R. at 340), Dr. Mack explicitly took into account Plaintiff's hypertension and a history of left bundle branch block and hypercholesterolemia (*id.* at 346). By giving great weight to Dr. Mack's opinion (*id.* at 14–15), the ALJ accounted for Plaintiff's heart conditions in the RFC. *See Skarbek v. Barnhart*, 390 F.3d 500, 504

(7th Cir. 2004) ("although the ALJ did not explicitly consider [claimant's] obesity," by adopting "the limitations suggested by the specialists and reviewing doctors, who were aware of [claimant's] obesity, . . . it was factored into the ALJ's opinion"). The ALJ also gave some weight to the assessments of Dr. Hare (R. at 13–14), who diagnosed Plaintiff with rheumatoid arthritis, affecting multiple joints; hypertension, not controlled; history of hypercholesterolemia; and history of left branch block (*id.* at 327). Thus, any error by the ALJ in not explicitly addressing all of Plaintiff's heart ailments was harmless. *See Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013) (although ALJ did not discuss any functional limitations resulting from claimant's obesity, "this type of error may be harmless when the RFC is based on limitations identified by doctors who specifically noted obesity as a contributing factor").

The ALJ's RFC determination also takes into account those portions of Plaintiff's testimony found credible. Plaintiff testified that although he was once able to lift 150–200 pounds, his capabilities are much less now. (R. at 32, 34). Based on this testimony and the medical evidence, the ALJ limited Plaintiff to light work, which requires lifting only 20 pounds occasionally, 10 pounds frequently. (*Id.* at 12, 340); *see* 20 C.F.R. § 404.1657(b).

The Court finds that the ALJ did not err in his determination of Plaintiff's RFC. He fully employed the evidence and Plaintiff's testimony to arrive at the maximum that Plaintiff can still do despite his physical limitations. *Craft*, 539 F.3d at 675–76.

**C. Summary**

In sum, the ALJ has built an accurate and logical bridge from the evidence to his conclusion. The ALJ's credibility, RFC, and step three determinations are all supported by substantial evidence.

## V. CONCLUSION

For the reasons stated above Plaintiff's Motion to Reverse the Final Decision of the Commissioner of Social Security [28] is DENIED, and Defendant's Motion for Summary Judgment [37] is GRANTED. Pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is affirmed.

E N T E R:

Dated: August 23, 2013

_____
MARY M. ROWLAND
United States Magistrate Judge